**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

—————————————

AMELIA EBERLE,

       Plaintiff,

v.                                     NO. 11-CV-141 WJ/WDS

JERMAL JACKSON, LAWRENCE HARLAN,
JUSTIN DUNLAP, and JAMES SCOTT BAIRD,
all in their individual capacities, THE BERNALILLO
COUNTY BOARD OF COUNTY COMMISSIONERS,
and JOHN DOES 1-5, inclusive,

       Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART**

       THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment

(**doc. 55**), filed January 31, 2012.  After considering the parties' briefs and the applicable law,

for the reasons herein given the Court finds that Defendants' motion shall be **GRANTED** in part

and **DENIED** in part.

**BACKGROUND**

**I.**     **Factual Background**

       The Court makes the following summary of facts based on the briefs and exhibits filed in

this case, viewed in the light most favorable to the Plaintiff and making every permissible factual

inference in favor of Plaintiff, for purposes only of the resolution of the present Motion for

Summary Judgment.

       Plaintiff Amelia Eberle was a cadet at the Bernalillo County Sheriff's Office Academy

class #29, which began in February, 2010.  Plaintiff's goal, like the other cadets in Academy

class #29, was to graduate from the Academy and become a certified deputy with the Bernalillo

County Sherriff's Office.

Defendant Deputy Sheriff Jermal Jackson was a Drill Instructor for that class, as was

Defendant Deputy Sheriff Lawrence Harlan.  Defendant Sergeant Justin Dunlap was the

Academy Coordinator and Defendant Lieutenant James Scott Baird was the Academy

Commander.

Plaintiff eventually resigned from the Academy after having been recommended for

termination.  Several incidents leading up to her departure are the focus of the litigation in this

case.

A.    *Physical Capabilities and Ability to Fight*

Plaintiff was smaller than many of her co-cadets, weighing approximately 120 pounds.

Although she met or exceeded the measured physical standards of the Academy, she struggled

more than her co-cadets with much of the physical training, and had difficulty keeping up

especially with her male co-cadets during such exercises as runs or push-ups.  Her drill

instructors tried to help her improve her physical strength and conditioning from the minimum

standards.  Nevertheless, Plaintiff felt as though her relationship with her co-cadets suffered in

part because of her small size and her physical abilities.  Plaintiff also felt that her drill

instructors furthered this problem by highlighting her physical difficulties during training, thus

reinforcing the idea in her co-cadet's minds that she either was not trying or did not have

sufficient capacity for the training.  In fact, Plaintiff began to feel ostracized from the rest of her

class.

Plaintiff felt that she was not accepted by others in her class because she was a small

woman who struggled with much of the physical training.  Other cadets made comments to that

2

effect, and she felt that much of the training approach of the drill instructors served to highlight

her difficulties and reinforce perceptions that she was not fitting in to the class.  Though she

never explicitly complained that she was being treated badly or was ostracized because of her

sex, she did complain in general terms to the drill instructors about the state of affairs.

One event in particular involved an exercise devised and administered by one of

Plaintiff's co-cadets and allowed by the drill instructors.  During this exercise, a cadet could

write down on an index card the name of any other cadet who was viewed as unworthy of being

in Academy class #29.  Those who were listed as being unworthy cadets were identified and

addressed in a group setting.  Plaintiff was one of those addressed, and she was told that some of

her co-cadets did not trust her physical abilities or her capacity to fight or support her co-cadets

in dangerous situations, especially compared with the male cadets.

Shortly after this index-card exercise, Plaintiff spoke with Defendant Harlan, voicing her

concerns about the exercise.

> I told Harlan that I thought the exercise was incredibly divisive and that it
> was counterproductive.  And he asked me how I felt about some of the comments
> that were made towards me during that exercise, such as about my size, how I'm
> smaller, how do I expect to fight somebody being as small as I am. That they
> would trust another man in the fight, they would rather have another man with
> them fighting than me.
> And Harlan asked me how I felt about the comments that were made. And
> I said, "Well, I think that females have a lot to offer this job and while I might not
> be able to fight as well as a 200-pound man, that not every situation has to end in
> physical altercation and that I think females bring really good reasoning skills to
> the table and deescalation techniques so that not every situation has to end
> physically."

(Eberle Depo. p. 77, doc. 62-1 at 4.)

Two days later, Defendant Harlan approached Plaintiff and her fellow cadets while they

were waiting for driving instruction to begin.  Harlan stood behind Plaintiff, and perceived that

3

she did not seem to notice his presence.  He attacked her, simulating an attack by a criminal, and

attempted to wrestle her weapon away from her.  The pair fell to the ground, and Plaintiff called

"82," the code for requesting help from other officers.  Several fellow cadets began to help

Plaintiff, and then Defendant Jackson joined what had become a general fray, which lasted only

moments.  After the encounter, Defendant Harlan placed an entry into Plaintiff's performance

review that reads:

> There were many substandard issues with Cadet Eberle's performance during this
> rating period. . . .
>
> On 04/29, I noticed that Cadet Eberle did not seem to be aware of her
> surroundings while standing on the driving track.  I was able to walk up behind
> and to the right of her, where I stood approximately three feet from her for a
> couple minutes.  I noticed that not only was she not aware that I was standing
> there, she had her hands placed behind her back.  I was able to take her handgun
> almost completely out of her holster, and would have accomplished this had
> another Cadet not stopped my action.  I then took her to the ground where I kept a
> hold of the grip on her gun for several more seconds until another Cadet broke my
> grip.  The only action I noticed Cadet Eberle took was to yell "82" several times.

(Recruit Performance Evaluation, week 11–13, doc. 62-3 at 6.)  Also, immediately after the

encounter, Defendant Jackson spoke with Plaintiff, and said something to the effect that "I don't

care what kind of verbal fucking judo you have, sometimes you're going to have to fight.  Your

82 [(backup)] may only be Carillo, or Rodriguez, or Young [(three female cadets)], and you're

going to have to fight."  (Jackson depo. p. 184–85, doc. 62-5 at 4.)  Plaintiff had, at the time of

the encounter, as yet received no training on fighting or combat tactics.

Of final note on the subject of Plaintiff's capacity to fight, one additional entry into

Plaintiff's review folder reads as follows:

> Cadet Eberle participated in three scenarios on 05/12, utilizing simunition
> weapons.  On the first scenario, Cadet Eberle was in close quarters with a suspect
> and she observed that the suspect had a handgun in his right rear pants pocket.
> Instead of taking care of the problem at hand, she chose to walk the short distance

to her partner and whisper to him about the presence of the weapon.  Because of her choice, she was almost shot, and would have been had it not been for her partner making physical contact with the suspect.  On the 2nd scenario, the suspect turned toward her pointing a gun, again in close quarters.  Cadet Eberle put her hands to her chest, yelled in fear and jumped backward into a corner of the room.  She did not draw her gun until the suspect shot both her and her partner. . . . She was verbally counseled (debriefed) after each scenario, about her lack of response to these situations.

(Recruit Performance Evaluation, week 11–13, doc. 62-3 at 6.)

During her time at the Academy, Plaintiff verbally complained numerous times to her drill instructors about the treatment discussed above and similar incidents, involving both her fellow cadets and her drill instructors themselves.  The complaints centered generally around treatment regarding her physical limitations as a small female.  Plaintiff did not however at any point explicitly complain that she was being subjected to sex discrimination, or was being treated differently specifically because of her sex, separate from her physical limitations and size.

B.       Range Safety Incidents and Injury

During Plaintiff's time at the Academy, two weapons safety violations occurred of importance,[1] one by Plaintiff and one by a male cadet.  On April 28, 2010, Plaintiff committed a safety violation at the shooting range.  She and two fellow cadets were given a task to assault a target.  During part of the exercise, Plaintiff was tasked as the "cover" or rear security.  She took up a rearward-facing position, and pointed her loaded weapon directly at eight fellow cadets and three instructors that she estimates were forty yards away.  Plaintiff had not received specific training on how to act as cover during the drill.  The following entry was placed in her

---

[1] Plaintiff points to some evidence of a third weapons safety violation in which a cadet named "Dykes" negligently discharged a shotgun into the ground.  Plaintiff provides insufficient information about this incident for it to be material to Plaintiff's case: it is unclear whether or to what extent the cadet was disciplined, and it is clear only that he eventually graduated from the Academy.  Without more, the Court considers this additional violation to be immaterial to the matters at hand and does not give it further consideration.

performance review:

> There were many substandard issues with Cadet Eberle's performance during this
> rating period.  On 04/28, Cadet Eberle was on the firearms range conducting
> drills.  At one point, she was covering eight classmates and three instructors with
> her handgun for an extended period of time, and even though an Instructor was
> yelling "Cease Fire," she failed to recognize the issue.  When asked about why
> this occurred, her answer was "I had tunnel vision."

(Recruit Performance Evaluation, week 11–13, doc. 62-3 at 6.)

On April 27, 2010, one day prior to Plaintiff's violation, a male cadet named Alexander

committed a violation where he inadvertently pointed his loaded weapon in the general direction

of one fellow cadet.  The exact circumstances are not clear; the cadet may have turned his

weapon, still pointing at the ground, in the general direction of a fellow cadet.  The drill

instructors viewed Alexander's violation as significantly less serious than Plaintiff's, although

still serious.  No notation about the incident was placed into cadet Alexander's performance

review for the applicable period.

On April 28, after Plaintiff had committed her weapons violation, Defendant Harlan

administered corrective action to both Plaintiff and Alexander for their respective violations.  In

front of the other cadets, Harlan ordered Alexander to first explain to his fellow cadets what he

had done wrong, and then to do twenty push-ups because he had pointed his weapon towards one

person.  Harlan then ordered Plaintiff to explain what she had done wrong, and had her do sets of

twenty repetitions of various exercises, one set of twenty for each of the eight cadets Plaintiff

had endangered with her weapon.  After Plaintiff had completed the exercises, Defendant Harlan

told Plaintiff that Defendant Jackson would be giving Plaintiff further corrective action.

On April 30, two days later, Defendant Jackson ordered Plaintiff to select eight cadets,

and carry them one-by-one across the parking lot and back.  The exercise was intended to be

additional correction for Plaintiff, simulating a situation where the eight cadets had been shot

and Plaintiff had to carry them to safety.  Plaintiff successfully carried four cadets, and then

upon her selection of a relatively small fifth cadet Defendant Jackson ordered her instead to

carry a larger cadet weighing approximately 185–200 lbs.  As Plaintiff was carrying the cadet,

she injured her knee, and was taken to the hospital.  The following memorandum was completed

on April 30, 2010, by Defendant Jackson concerning the entire incident:

> On or about 28 April 2010 Cadet Amelia Eberle was participating in a three
> person assault team.  During this drill she was tasked with rear security.  while
> conducting rear security Cadet Eberle raised her firearm up and presented it to
> over 8 other cadets and instructors.  When asked why she raised her firearm Cadet
> Eberle stated she got confused and didn't realize what she was doing.
>
> On or about 28 April 2010 while participating in corrective action directed by DI
> Harlan Cadet Eberle began to smile and giggle.  Other cadets saw this and began
> to raise concerns [sic] Cadet Eberle's lack of respect and safety for her fellow
> classmates, superior officers and herself.
>
> On or about 30 April 2010 Cadet Eberle was participating in corrective action
> [sic] Cadet Eberle was instructed to select 8 fellow cadets.  The 8 selected were
> instructed to stand on one side of the parking lot behind the range house.  Cadet
> Eberle was instructed to pick up a cadet a [sic] walk across the parking lot and
> back with each cadet.  Cadet Eberle was asked several times about her welfare
> and her choice of carrying technique.  While carrying Cadet Bailey Cadet Eberle
> fell.  She was transported to Presbyterian Hospital for evaluations and x-rays.

(Doc. 62-9.)

### D.    Hospital Treatment and Chain of Command Reprimand

Defendant Jackson transported Plaintiff to the hospital.  Plaintiff was diagnosed as

having suffered a patellar dislocation.  Plaintiff was at increased risk for a patellar injury because

of the characteristics of her left knee, and she had noticed on two prior occasions that her left

knee "fell out of place," but those occasions did not result in injuries, and Plaintiff did not report

any problems with her knee on her medical and occupational history form.  She was given pain

7

medications and released back to light duty with some medical restrictions.

While Plaintiff was in the hospital, Defendant Dunlap went to the hospital, learned of the facts from Defendant Jackson, and filled out Plaintiff's workers' compensation forms for her. The forms stated that Plaintiff had been injured during a "Team Building/Fireman's Carry" exercise, during which "cadets were carrying each other from point A to point B."  (Doc. 62-10.)

After Plaintiff had been taken to the hospital, she received a text message from Sergeant Andrea Taylor.  Plaintiff was personal friends with Sergeant Taylor, and when the Sergeant had heard that one of the cadets had been injured she contacted Plaintiff to see whether it had been her.  Plaintiff communicated back and forth with Taylor.  When the contacts came to the attention of Defendant Harlan, he prepared a written reprimand for a violation of the "chain of command" regulation.  The reprimand cited an incident where Plaintiff was pulled over by police, and notified Sergeant Taylor about it rather than Academy staff; the reprimand also cited the contact with Sergeant Taylor regarding Plaintiff's injury, and other unspecified contacts.

Defendants Harlan and Baird met with Plaintiff to give her the reprimand, at which time they discovered two factual inaccuracies: first, Sergeant Taylor had initiated the contact, not Plaintiff; and second, the contact came to the staff's attention via Defendant Jackson, not Sergeant Taylor.  In light of these inaccuracies, the reprimand was withdrawn; nevertheless, an unsigned copy of the reprimand somehow found its way into Plaintiff's personnel file.

       E.    *Sexual comments and Plaintiff's Termination/Resignation*

Plaintiff's poor relationship with her fellow cadets came to a head in the latter half of May.  Open hostilities with one cadet in particular, Cadet Norton, had resulted in Plaintiff referring to Norton as a "douche bag."  On the morning of May 19, Norton confronted Plaintiff about her insult, and during the heated confrontation Norton said that if she ever called him a

douche bag again, "it would be no more Mr. Nice Guy," and later in the exchange told her "I will break it off inside you during DT's" (the upcoming "defensive tactics" course).   (Eberle depo. p. 113, doc. 62-1 at 6.)

Plaintiff reported the confrontation to Defendants Jackson and Harlan, telling them that Norton had threatened her.  While she couldn't remember exactly what Norton had said, a little while later she remembered and told the drill instructors the exact phrase.  Harlan documented what she told him as "something to the affect of 'wait until DTs.  I am gonna break you' or 'I am gonna break it off in you.'"  (Doc. 57-10 at 1.)  Plaintiff interpreted Norton's words as sexual in nature; however, she never communicated that understanding to the Academy staff, none of whom understood Plaintiff to be making a complaint about sexual harassment.

Defendant Harlan called Norton into the office and questioned him about the confrontation.  Norton admitted that he had told Plaintiff that they would "go rounds" during defensive tactics, and that he did not think that she deserved to be at the academy.  However, he stated that his words were not intended to be a threat to her.  Defendant Harlan then spoke with several other cadets who had been present during the confrontation.  None of the cadets considered what they had heard Norton say to be a threat to Plaintiff.  Harlan's brief investigation was oriented towards determining if Plaintiff was in danger of physical harm during the defensive tactics course; there is no evidence that Harlan thought Plaintiff was complaining of a sexual threat, as opposed to a simple physical threat.

After determining that Norton's words did not seem to be an actual threat to Plaintiff, Defendant Harlan determined that the proper course of action would be for Plaintiff and Norton to attempt to resolve their conflict; and so he sent the two of them into a room to discuss their conflict.  Afterwards, both indicated that they had reached a resolution.  Harlan told Norton that

9

his statements could be considered a threat, and therefore the incident would be documented in

Norton's file.  However, no evidence of any documentation appears on Norton's evaluation for

that week.  Defendant Harlan prepared a memorandum documenting the incident, in which he

described his investigation, and then his conclusion:

> After speaking to these five Cadets, I was not able to identify any specific threat
> that was verbalized toward Cadet Eberle.  Again, I placed a lot of weight on what
> Cadets Beasley and Byrd told me, as both of these Cadets have displayed sound
> integrity, and Cadet Byrd seemed to be Cadet Eberle's closest partner in the class.
> I came to the decision to have Cadets Eberle and Norton have a controlled
> discussion on a one on one basis at the end of the day. . . .
>
> I also told her that I was going to have her and Cadet Norton sit down together at
> the end of the day to discuss how they were going to learn to work together.
> Cadet Eberle agreed with this resolve [sic] by stating "I think that would be
> good."  I told her that I would rather not be in the room when they had this
> discussion, but that if she felt more comfortable I would be inside or just outside
> the room.  She told me that she did not think that would be necessary and stated
> that they would work through the issues. . . .
>
> They were in that room for approximately 15 to 20 minutes.  Both of them walked
> back into Classroom #1 at the same time.  When Cadet Eberle looked at me, I
> held my thumb up and she nodded her head up and down. . . . I took this to mean
> that they had a positive outcome and I allowed the Class to dismiss for the day.

(Doc. 57-10 at 2–3.)

That same afternoon of May 19, three other cadets (Bartram, Hessinger, and Keeling, all

males) approached the drill instructors, claiming that Plaintiff had made offensive comments to

them.  The three cadets stated that, though the incidents had happened in the past, they had

spoken together the previous weekend and decided to come forward.

Defendant Harlan spoke with Defendant Dunlap, advising him both about the conflict

between Plaintiff and Norton, and about the complaints made by the three cadets.  Dunlap

approved of the planned resolution of the conflict, and with regard to the complaints told Harlan

to interview the members of the class and ask them whether anyone had observed sexual

comments or sexual discrimination by anyone in the class.  Harlan did so, calling each cadet individually into his office.  Those who answered affirmatively were asked to write out statements.  Eight cadets wrote out statements, all of them regarding Plaintiff, alleging various comments that Plaintiff had made.  In total, the complaints were thus:

- Plaintiff asked male cadet Keeling whether, during his self-imposed dating fast he could still masturbate;

- Plaintiff inquired of cadet Bartram, since the male cadets showered together, which of them had the biggest penis, and then stated that she thought she could guess;

- Plaintiff asked cadet Hessinger if the male cadets measured and compared each other's penises in the shower;

- Plaintiff asked Cadets Byrd and Hammerel if they masturbate while watching internet pornography.

Plaintiff admits that she asked Keeling about masturbating, but denies the truth of the other allegations; Plaintiff also admits to having called cadet Norton a douche bag.  Plaintiff explains that "there was constant horsing around and joking around and locker-room type conversations going on every single day," (Eberle depo. p. 126, doc. 56-1 at 13) and that she was sometimes involved in those conversations.

Several of the complaints also relate the cadets' concerns that Plaintiff would use allegations of sexual harassment as a way to benefit herself, and that Plaintiff was untrustworthy. (*See* doc. 57-9 at 2 ("I was afraid that she could try to turn this back on the rest of the class since through the academy she has proven to be untruthful."); *id.* at 5 ("Every attempt to bring her onboard has met with resistance, or hints of repercussions for giving her a hard time."); *id.* at 9 ("I feel that Cadet Eberle will use any information she can to try and move herself forward in the class no matter who she gets kicked out or what it takes to get there.  I do not know if her questions towards me were a setup to try and get me in trouble or if she had different intentions,

11

but I do not trust her and feel she is going to be a major problem for this department.").)  There were also general concerns about Plaintiff.  (*See* doc. 57-9 at 5 ("[The] majority of the class is tired of dealing with Cadet Eberle's continued poor attitude. . . . She is not liked or trusted by the majority of the class and does not seem to really care.").)

Plaintiff was not interviewed at this time.  Harlan gave the written statements to Defendant Dunlap, who took them to Defendant Baird.  Baird prepared a memorandum recommending to Sheriff Gonzales that Plaintiff be separated from the Academy.  As grounds for that separation, the memorandum cites:

- a serious safety violation on the range;

- receiving a traffic citation from an APD officer during the Academy;

- repeated violations of the chain of command;

- a continued practice of sexually harassing male members of the Cadet Class;

- progressive discipline, up to and including a written reprimand.

(*See* Memorandum Regarding Termination of Cadet Amelia Eberle, doc. 62-20 at 1–2.)  The "written reprimand" is apparently a reference to the reprimand that was drafted but withdrawn for Plaintiff's violations of the chain of command, as no other written reprimands were given to Plaintiff.  On May 21, Defendants Baird, Dunlap, and Jackson met with Plaintiff, and informed her that the decision had been made to separate her from the Academy.  Defendants summarized generally the allegations against Plaintiff, but did not seek any response from Plaintiff.  Defendants gave Plaintiff the option of resigning.  Plaintiff signed her letter of resignation, and it was accepted.

## II.   Procedural History

Plaintiff filed her Complaint with this Court on February 11, 2011, alleging five counts:

Count I—sex discrimination (including sexual harassment) in violation of Title VII against Defendant County;

Count II—retaliatory discharge for filing a complaint of sex discrimination in violation of Title VII against Defendant County;

Count III—sex discrimination under § 1983 in violation of the equal protection clause against Defendants Jackson, Harlan, Dunlap, and Baird in their individual capacities;[2]

Count IV—personal injury under a state intentional tort cause of action, against Defendants County and Jackson;

Count V—retaliatory discharge for filing a workers' compensation claim, in violation of the workers' compensation statute, against Defendant County;

## LEGAL STANDARD

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 671 (10th Cir. 1998).   To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Bausman v. Interstate Brands Corp*., 252 F.3d 1111 (10th Cir. 2001).

## DISCUSSION

### I.	Title VII

Plaintiff's Claim I asserts disparate treatment because of sex in violation of Title VII of

---

[2] Plaintiff also asserts certain claims against John Does 1–5, who are unnamed supervisors of Plaintiff at the Academy.  None of the motions mention the John Does, nor does Plaintiff replace "John Doe" with any specific names of additional supervisors against whom Plaintiff wishes to assert claims.  Discovery has closed, and therefore the Court considers Plaintiff to have abandoned her "John Doe" assertions, and will therefore remove them from consideration in the case, limiting the matter under consideration to claims asserted against the named Defendants.

the Civil Rights Act of 1964. This disparate treatment is asserted under two differing theories: that Plaintiff was subjected to discriminatory adverse employment actions, and also that she was subjected to sexual harassment in the form of a hostile work environment. Plaintiff's Count II asserts retaliatory discharge for reporting sexual harassment in violation of Title VII. Plaintiff asserts these claims against Defendant County, and she has properly exhausted her administrative remedies. The Court will address each theory in turn.

     A.    *Adverse Employment Actions*

         i.    <u>Corrective Action</u>

Though Plaintiff was never formally disciplined, Plaintiff asserts that the informal discipline on April 30, 2010, during which she was made to carry other cadets and sustained a knee injury, violated Title VII.

This claim of disparate treatment is governed by the *McDonnell Douglas* burden-shifting framework. Plaintiff must first establish a prima facie case of sex discrimination, which, in the context of disparate discipline, "must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007) (internal citations omitted). If Plaintiff is able to meet this initial burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.*

Plaintiff clearly establishes that she, as a female, belongs to a protected class. As to the second prong, under Tenth Circuit precedent, "[a] written warning *may* be an adverse

employment action only if it effects a significant change in the plaintiff's employment status."

*Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) (emphasis in

original).  Plaintiff argues that—though the disciplinary exercise of April 30 was even less

formal than a written warning—it effected a change in Plaintiff's employment because

Defendant Baird's memorandum recommending Plaintiff's termination makes reference to

"progressive discipline," implicitly including the April 30 incident, and that therefore the April

30 incident made it more likely that Plaintiff would be terminated.

Plaintiff fails to show that the complained-of disciplinary action on April 30, 2010, was

an adverse employment action for purposes of Title VII.  The fact that Defendant Baird's

memorandum cites numerous infractions by Plaintiff, and generically refers to "progressive

discipline," does not suffice to prove that the particular incident on April 30 "effect[ed] a

significant change in [Plaintiff's] employment status."  *Id.*  In *Haynes*, 456 F.3d at 1224–25, the

Tenth Circuit discussed the requirements for showing that a written warning is an adverse

employment action:

> For example, in *Roberts*, the defendant had peppered plaintiff's file with "twenty
> warning letters," and the record demonstrated "that the more warnings an
> employee received, the more likely he or she was to be terminated for a further
> infraction."  Thus, the effect on the plaintiff's employment status was an
> immediate placement in an at-risk status.  The facts in this case do not
> demonstrate that Haynes' placement on the PIP in November had any immediate
> effect on her employment status.  She was not demoted, her pay did not change
> and her responsibilities were not significantly modified.

*Id.* (quoting *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998)) (internal

citations and footnotes omitted).  Likewise, the facts presented by Plaintiff in this case do not

demonstrate that the disciplinary exercise had any immediate effect on her employment status.

She demonstrates no tangible change in her employment status whatsoever resulting from the

discipline.  The mere fact that Defendant Baird refers to progressive discipline in his memorandum does not suffice to make every step of discipline, no matter how insignificant, an adverse employment action under Title VII.  So too Plaintiff's alternative argument—that her resulting injury interfered with her ability to participate in class activities—fails because, though the injury was an unfortunate result from the disciplinary action, it was not itself an intended part of the discipline (as the Court addresses in more detail *infra* in the discussion of Plaintiff's state-law personal injury claim).  Further, Plaintiff presents no evidence as to why the unfortunate but apparently necessary precaution of a temporary light duty assignment changed the terms and conditions of her employment.

In sum, even had Plaintiff received *formal* written discipline she would still have had to show evidence that it effected a significant change in her employment status, and so failing to make that same showing for an *informal* disciplinary exercise is fatal to Plaintiff's prima facie case.  Therefore, the Court need not address the other elements of the prima facie case.

        ii.    <u>Termination</u>

Plaintiff's second allegation of disparate treatment is her effective termination.  The *McDonnell Douglas* framework again applies, and Plaintiff must establish a prima facie case by showing that (1) that she is a member of a protected group, (2) that she suffered an adverse employment action, and (3) that similarly situated employees were treated differently.  *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

Plaintiff, as noted previously, is within a protected class.  Plaintiff resigned from the academy, but she points out that she resigned only after having been told in no uncertain terms that she would otherwise be terminated.  Defendants do not contest that Plaintiff was subject to an adverse employment action, and the Court agrees and considers Plaintiff's resignation to have

16

been a *defacto* termination.  Therefore Plaintiff has established the first two prongs of the prima facie case of discrimination.

As to the third prong, Plaintiff argues that she was similarly situated to Cadet Norton, a male cadet, and that the difference in treatment between Plaintiff and Norton establishes the requisite inference of discrimination required for the prima facie case.  However, Plaintiff has not shown that she was similarly situated to Norton.

"When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'"  *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (citing *EEOC v. Flasher*, 986 F.2d 1312, 1316 (10th Cir.1992)).  Plaintiff argues that both she and Norton were accused of similar sexually harassing statements, and the differing investigation and punishment of the two sets of statements shows that she was subject to discriminatory termination because of her sex.  However, the facts, taken in the light most favorable to Plaintiff, do not support an inference that the two sets of statements were similar.

Norton's comment, "I'm gonna break it off in you," was delivered in the heat of an argument whose origin was Plaintiff's having called Norton a "douche bag."  Norton's comment is not overtly sexual, and though Plaintiff offers evidence that she and another female who heard the comment interpreted the comment as a sexual threat, it is the reasonable understanding of Defendants that matters, and Plaintiff has offered no evidence, other than plain assertion, that Defendants did or should have understood the comment in a sexual light.[3]  Instead, the only conclusion supported by the evidence is that Defendants understood the comment as a physical,

---

[3] The Court further considers this point *infra* in the discussion of Plaintiff's retaliation claims.

non-sexual threat, and that such an interpretation was reasonable absent any indication from Plaintiff that she considered the comment to be sexual harassment.

Defendants, therefore, reasonably investigated the situation as a physical threat, with an eye primarily to restoring the working relationship between Plaintiff and Norton after what had been a heated argument.  After deciding to allow Plaintiff and Norton to attempt to work out their differences, and after Plaintiff declined Defendant Harlan's offer to be present during the conversation, Plaintiff indicated by a thumbs-up sign that her conflict with Norton had been resolved.  In other words, the entire situation bears all the hallmarks of an ordinary verbal fight followed by a facilitated reconciliation.

On the contrary, with regard to Plaintiff herself, several cadets together made formal complaints of sexual harassment.  The situation was not one of resolving an immediate conflict between two cadets who had exchanged heated words.  Instead, multiple cadets made formal complaints explicitly alleging sexual harassment.  The fact that Defendants reacted differently in investigating and resolving the two situations does not satisfy Plaintiff's burden to bring forward evidence of disparate treatment, because Plaintiff has not shown that her comments and Norton's were violations of "comparable seriousness."  On its face, Norton's comment was a physical threat in the midst of a heated argument, while Plaintiff's comments, as alleged by her fellow cadets, were multiple comments of an explicitly sexual nature, complained of formally as sexual harassment.  "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct. 'Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.'"  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (quoting *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Services*,

165 F.3d 1321, 1330 (10th Cir. 1999)).  Therefore, while Plaintiff's burden to show that

similarly situated individuals outside of her protected class were treated differently is "not

onerous," *see Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005), and she must

not be required to show exact similarity, nevertheless the situation with Cadet Norton is so

dissimilar to Plaintiff's that she has not met her burden to show that similarly situated

individuals were treated differently from herself.

　　　Even had Plaintiff established her prima facie case, the grounds for termination cited in

Defendant Baird's memorandum provide a non-discriminatory reason for her termination.

Those grounds involve reasons such as her safety violation on the pistol range, her failure to

report a traffic ticket, her violation of the chain of command rules, and her sexual comments

reported by other cadets.  Plaintiff does not challenge the substance of any of these stated

reasons, with the exception of challenging *some* of the sexual comments.[4]  Therefore, even

taking all of the evidence in the light most favorable to Plaintiff, Defendants would have

satisfied their burden to show a non-discriminatory reason for Plaintiff's termination.

　　　Plaintiff does not offer sufficient facts to show that Defendants' stated reasons were

pretextual.[5]  "To show that the defendant's proffered [sex-neutral] reasons were actually a pretext

---

[4] While Plaintiff appears to contest the chain of command violations, she in fact only contests the misstatement of fact that she initiated the conversations with Sergeant Taylor about her injury.  She does not contest, in her submissions to this Court, that she had repeated contact with the Sergeant, that any contact with Sergeant Taylor during the Academy was disapproved of, or in particular that reporting her traffic ticket to Sergeant Taylor rather than her Academy chain of command was a violation of those rules.

[5] Plaintiff offers Defendant Baird's mention of a written reprimand, and the investigation into Plaintiff's sexual comments, which Plaintiff characterizes as inadequate, in order to show that Defendants' real object was termination of Plaintiff because she was a woman.  The Court recognizes that these facts could be considered as being offered as facts and circumstances creating an inference of discrimination for purposes of the prima facie case.  However, the Court sees them as more appropriately characterized as facts attempting to show that Defendants' proffered reasons for her termination were pretextual.  Under either type of analysis, Plaintiff's factual showing is inadequate, and therefore the Court's choice as to how to address Plaintiff's arguments does not bear dispositive importance.

for discrimination, this Court has held that the plaintiff must demonstrate that the defendant's 'proffered [sex-neutral] reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'"  *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)).  In attempting this showing, Plaintiff argues that the written reprimand cited in Baird's memo was withdrawn, and that therefore Defendant Baird was relying "upon accusations which he knew to be false."  (Doc. 62 at 23 (emphasis omitted).)  However, the facts themselves support no such inference.  The facts show that there was some misunderstanding about the status of the written reprimand: Defendants Harlan and Jackson believed that the reprimand had been withdrawn, while Defendant Baird believed that the reprimand was effective.  The facts support the truth of this misunderstanding: a copy of the reprimand, unsigned as if it had been withdrawn, was included in Plaintiff's file as if Plaintiff had in fact been reprimanded.  Additionally, most of the substance of the reprimand is uncontested by Plaintiff,[6] and therefore Defendant Baird was not relying upon accusations which he knew to be false, even if he mistakenly stated that Plaintiff had been given a written reprimand, because the accusations of chain of command violations were essentially uncontested by Plaintiff.

Plaintiff also argues that the investigation into Plaintiff's alleged sexual comments was not sufficiently thorough.  However, when eight different cadets made formal complaints about her sexual comments, and when Plaintiff herself admits the allegations that she asked a male cadet about his masturbatory habits, the fact that Defendants did not conduct a more thorough

---

[6] *See*, *supra*, note 4.

20

investigation or regard the allegations with suspicion does not suffice to show that Defendants'

proffered reasons for Plaintiff's termination were pretextual.  Defendants are not required by

Title VII to follow certain procedures in their investigations, neither are they required even to

follow their own ordinary procedures.  *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222

(10th Cir. 2007) ("The mere fact that an employer failed to follow its own internal procedures

does not necessarily suggest that . . . the substantive reasons given by the employer for its

employment decision were pretextual.") (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454

(10th Cir. 1995)).  Instead, to support any inference of pretext by a failure to follow procedures,

Plaintiff must show that Defendants considered those procedures to be mandatory.  *See Berry*,

490 F.3d at 1222.  While Plaintiff attempts to show that interviewing the accused in a sexual

harassment situation was a mandatory procedure, the evidence Plaintiff offers does not support

such a conclusion.  The text of the sexual harassment policy offered by Plaintiff states that

> In investigating a report or complaint of sexual harassment, the County . . . shall
> investigate the matter independently as it sees fit . . . .  Steps to be taken in the
> investigation shall be determined based upon the particular facts and
> circumstances of any given complaint, and may include but are not limited to the
> following: . . . When first interviewing the Respondent, remind him/her of the
> County's policy against retaliation for making a complaint of sexual harassment.

(Doc. 62-19 at 3–4.)  In other words, Defendant County reserves the discretion to do exactly

what it did in this case: conduct an investigation that it deemed adequate in light of the

circumstances.  Plaintiff points to a requirement in the policy that a report shall be completed

that includes a summary of the Respondent's response, but Plaintiff has not complained of the

failure of Defendant to prepare an adequate report, but instead the failure to seek out Plaintiff's

side of the story.  "Although allowing [Plaintiff]to complete her side of the story would seem to

be the most fair way of addressing the situation, we cannot say that [the employer's] failure to do

21

so in these circumstances constitutes a 'disturbing procedural irregularity' sufficient to prove pretext." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007); *see also Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. Appx. 686, 695-96 (10th Cir. 2008) (unpublished) (the fact that employer did not seek out employee's side of the story does not support inference of pretext where employee offers no evidence that employer believed getting both sides to story was mandatory policy).

Additionally, even if Plaintiff had shown that Defendants' had violated the sexual harassment procedures by failing to interview her, that alone would not sufficiently rebut all of Defendants' stated reasons to show that they, as a whole, were pretextual, as she must where an employer offers multiple legitimate justifications for an employee's termination. *See Jaramillo v. Colorado Jud. Dept.*, 427 F.3d 1303, 1309–10 (10th Cir. 2005).  Plaintiff does not contest the fact that she committed a serious safety violation at the pistol range, received a traffic citation, committed multiple chain-of-command violations, and made sexual remarks to her male co-cadets which her supervisors viewed as sexual harassment.  Therefore identifying a procedural defect in Defendants' investigation of the sexual harassment accusations would not serve to call into question the substance of the main body of legitimate justifications offered by Defendants for Plaintiff's termination.

Therefore, even had Plaintiff satisfied her initial burden of establishing a prima facie case of disparate treatment with respect to her termination from the Academy, which the Court holds she did not, she would still not have successfully carried her burden to show that Defendant's proffered non-discriminatory reasons for her termination were pretextual.

*B.     Hostile Work Environment*

Plaintiff asserts a claim of sexual harassment creating a hostile work environment under

22

Title VII against Defendant County.  Title VII's prohibition against sex discrimination includes a ban on sexual harassment.  *Harris v. Forklift Systems, Inc*, 510 U.S. 17, 21 (1993); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986).  For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1264 (10th Cir. 1998) (quotations omitted).  In order to determine whether conduct was sufficiently severe or pervasive enough to be actionable sexual harassment, a court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Cadena v. The Pacesetter Corp.*, 18 F.Supp.2d 1220, 1226 (D. Kan. 1998) (citing *Faragher*,  524 U.S. 775 (1998)) (internal quotes omitted).  In considering these factors, a court also must consider the context in which the conduct occurred.  *Id.* (citing *Smith v. Norwest Financial Acceptance, Inc*., 129 F.3d 1408, 1413 (10th Cir.1997)).  The harassing conduct must be "both objectively and subjectively abusive." *Turnbull v. Topeka State Hospital, et al.*, 255 F.3d 1238, 1243 (10th Cir. 2001) (citation omitted).

In total, Plaintiff offers the following incidents as evidence of sex harassment:

- Unspecified snide comments, remarks, or other non-verbal signs of disapproval made with regard to Plaintiff throughout the course of the Academy by instructors and fellow cadets;

- Index card exercise where several fellow cadets told Plaintiff in front of the class that she did not belong at the academy because of her lesser physical capabilities;

- Defendant Harlan's comments regarding the lesser capacity of women to fight;

- Incident where Defendant Jackson tackled Plaintiff and subsequently made the comment to her about having to fight despite being adept at "verbal fucking judo";

- Physical discipline involving Plaintiff's being told to carry fellow cadets, during which Plaintiff's knee injury occurred;

- Norton's statement that he would "break it off" in Plaintiff during combat training.

These factual allegations by Plaintiff, which involve repeated comments and progressive ostracization, could support a conclusion that they were pervasive. *See Cadena v. Pacesetter Corp.*, 18 F. Supp. 2d 1220, 1228 (D. Kan. 1998) (holding that "a number of sexually suggestive and or sexually demeaning remarks, at least two of which were repeated on numerous occasions over a period which spanned only two to three months" was sufficiently pervasive to be a hostile environment). Plaintiff's allegations also involve a physical threat, explicit reference to the physical shortcomings of women, male cadets' stated preference for working with male co-officers, and physical punishment—possibly intended to highlight Plaintiff's physical difficulties as a small woman—which resulted in Plaintiff's injury and subsequent limitations on her ability to train. Such facts, while perhaps slim, still serve to establish the minimum requirement necessary for a jury to infer that Plaintiff was subjected to a hostile workplace because of discrimination against her as a woman. Rough training can be expected and should perhaps be desired in the formation of future law enforcement officers. *See, e.g.*, *Richardson v. City of Albuquerque*, 857 F.2d 727, 730 (10th Cir. 1988), *overruled on other grounds by Melton v. City of Oklahoma City*, 928 F.2d 920 (10th Cir. 1991) (denying motion for new trial where instructors harassed female cadet, but where evidence showed that all police cadets received harassment as part of the "high-stress training program regardless of their age or sex"). But at some point honest discussion of differences between men and women, targeted physical punishment, and

24

alienating disapproval from peers crosses a line, and on the factual showing presented to the Court it is the province of a jury to decide whether that line has been crossed in this case. *See, e.g.*, *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (giving as an example of a hostile work place a situation where "a woman, entering a work environment that previously has been all-male [encounters] severe, sustained hostile treatment by her male supervisors and/or co-workers") (quoting 3 Lex K. Larson, Employment Discrimination § 46.01[3] (2d ed.2000)).

Therefore summary judgement is denied on Plaintiff's claim against Defendant County that she was subjected to sexual discrimination because of a hostile workplace in violation of Title VII.[7]

C.    *Retaliation Under Title VII*

Title VII prohibits retaliation for an employee's opposition to an unlawful employment practice or participation in a protected activity.  §42 U.S.C.  2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action."  *Williams v. W.D. Sports, N.M., Inc*., 497 F.3d 1079, 1086 (10th Cir. 2007).  As to the first element, "[a]lthough no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a [discriminatory practice]."  *Hinds v. Sprint/United Management Co.*, 523 F.3d

---

[7]While the Court here denies summary judgment, the Court considers it to be an exceedingly close call, and that the facts in this case barely suffice to satisfy the standard for hostile work environment.  Therefore, the Court is open to considering further motions from Defendants with regard to this claim during the pre-trial phase.

1187, 1203 (10th Cir. 2008); *see also Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188

(10th Cir. 2002) (concluding that the absence of a reference to unlawful discrimination precludes

a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know

that the employee at least in part is engaging in protected opposition).

      Plaintiff alleges that she engaged in an activity protected by Title VII when she notified

her drill instructors about the comment made to her by Cadet Norton.  As briefly discussed

above, Plaintiff had previously called cadet Norton a "douche bag," and Norton confronted her

about it.  The confrontation was heated, and was overheard by several other cadets.  During the

confrontation, Norton told Plaintiff that he would "break it off inside" Plaintiff during defensive

tactics training.  Plaintiff later reported Norton's comment to her drill instructors.

      At no point did Plaintiff indicate to her drill instructors that she considered the comment

to be sexual harassment, or sexual in nature at all.  Plaintiff attempts to argue that the comment

is so overtly sexual that she had no need to explain her interpretation, and that Defendants should

have reasonably interpreted her complaint to be a complaint of a sexual threat or sexual

harassment.  However, the comment is not overtly sexual, nor so obviously sexual that the only

reasonable interpretation of the comment was as a sexual threat.[8]  Plaintiff provides no evidence

that her drill instructors or any Defendants understood her to be reporting sexual harassment,

rather than a simple verbal altercation.  "An employer's action against an employee cannot be

*because* of that employee's protected opposition unless the employer knows the employee has

---

[8]While this plays no role in the Court's analysis, the Court notes that not only is Norton's comment not overtly sexual, but that if it resembles anything the Court has heard before it resembles a common exaggerated threat of punishment, exemplified by Coach Boone in the feature film "Remember the Titans," as he addresses his football team: "We will be perfect in every aspect of the game.  You drop a pass, you run a mile.  You miss a blocking assignment, you run a mile.  You fumble the football, and I will break my foot off in your John Brown hind parts . . . and then you will run a mile."  Coach Boone's remark is clearly non-sexual.

engaged in protected opposition."  *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188

(10th Cir. 2002) (emphasis in original).  Therefore, Plaintiff's complaint to Defendants regarding

Norton's statement to her cannot serve as a basis for a retaliation claim, because it was not made

sufficiently clear to Defendants that Plaintiff was complaining of sexual harassment.

 However, Plaintiff also alleges retaliation for her more numerous complaints through the

course of the Academy regarding her treatment by the drill instructors and fellow candidates.

Plaintiff states that "The general undertone of every complaint that I had and that I made with

Jackson was that I am being treated badly and it's always about my size and that I'm a female.

And whether or not that's how he perceived it, I can't speak for him.  But I feel like that was

constantly the undertone of every complaint I was making."  (Eberle Depo. p. 80, doc. 62-1 at 4.)

Plaintiff admits that she never explicitly said words to the effect that she was being discriminated

against because she was female, and Defendant argues that undertones are not enough.

However, undertones and perceptions *are* enough if they reasonably convey to the employer that

a plaintiff was complaining of discrimination, and taking the evidence in this case in the light

most favorable to Plaintiff, her complaints were enough to convey to Defendants that she was

complaining of discrimination.  In particular, Plaintiff's conversation with Defendant Harlan

after the index-card exercise could clearly convey that she felt she was being treated differently

because she was a female.

 As to the second prong, Plaintiff argues that the April 30 disciplinary exercise was a

material adverse action.  The Court has already held that that exercise was not an adverse

employment action for purposes of Plaintiff's disparate treatment claims.  However, the standard

is different for a retaliation claim.  For purposes of retaliation, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). Additionally, "[a]n employer can effectively retaliate against an employee for exercising his or her protected rights by taking actions not directly related to his [or her] employment." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007) (internal quotations omitted, alterations in original). Therefore, while before the Court addressed whether the exercise effected a material change in Plaintiff's employment, in the current context the Court inquires only whether the exercise was adverse enough to dissuade a reasonable employee from making further claims of discrimination. The exercise was physically strenuous, and depending on the particular facts (such as how large the parking lot was, how tired Plaintiff was, and how heavy her fellow cadets were) could have been quite physically daunting. Additionally, it involved Plaintiff being singled out in front of her fellow cadets, and therefore was potentially embarrassing, even perhaps humiliating. The Court concludes that faced with the prospect of the exercise in question, a reasonable employee in Plaintiff's position could have been dissuaded from making or supporting a claim of discrimination. Therefore, Plaintiff has satisfied the second prong.

Plaintiff argues that a causal connection can be inferred, in satisfaction of the third prong, by the proximity of her complaints and the exercise. The timeline is this: Plaintiff, after the index card exercise where fellow cadets told her they would prefer a male partner to her because of her inability to fight, complained about the exercise to Defendant Harlan, and made the following statement:

> Well, I think that females have a lot to offer this job and while I might not be able to fight as well as a 200-pound man, that not every situation has to end in physical altercation and that I think females bring really good reasoning skills to the table

28

and deescalation techniques so that not every situation has to end physically."
(Eberle Depo. p. 77, doc. 62-1 at 4.)  Two days later, Defendant Jackson, after tackling Plaintiff,
made the following comment: "I don't care what kind of verbal fucking judo you have,
sometimes you're going to have to fight.  Your 82 [(backup)] may only be Carillo, or Rodriguez,
or Young [(three female cadets)], and you're going to have to fight."  (Jackson depo. p. 184–85,
doc. 62-5 at 4.)  One day after that, Defendant Jackson administered the April 30 disciplinary
exercise.

The Court considers the extremely close temporal proximity between the above events,
as well as Defendant Jackson's comment and the nature of the exercise, sufficient to support an
inference of a "causal nexis" between the complaints and the disciplinary exercise.  Therefore,
Plaintiff has offered sufficient evidence to make a prima facie case of retaliation, and
accordingly under the *McDonnell Douglas* framework, the burden shifts to Defendant to provide
a non-discriminatory reason for the disciplinary exercise.

Defendants argue that the purpose behind the disciplinary exercise was to discipline
Plaintiff for her range safety violation, which was serious enough to warrant additional physical
punishment to the exercises that Plaintiff had already been made to do as punishment for the
violation.  According to Defendants, the exercise was a simulation of a situation where Plaintiff
had to carry eight wounded fellow cadets to safety, and that it was appropriately related to her
safety violation where she had endangered eight cadets.  In other words, Defendant states that
the reason for a disciplinary exercise was Plaintiff's safety violation, and the particular choice of
disciplinary exercise was to provide appropriate punishment for Plaintiff's having endangered
eight other candidates.  This satisfies Defendant's burden as a permissible non-discriminatory
reason for the disciplinary exercise.

Accordingly, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a sham.

> A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.  The plaintiff need not prove the defendant's reasons were false, or that [sex] was the sole motivating factor in the employment decision.  Rather, the plaintiff must show that [sex] actually played a role in the defendant's decisionmaking process and had a determinative influence on the outcome.

*Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994) (internal quotations and citations omitted).  Plaintiff does not argue that the disciplinary exercise was unrelated to her safety violation.  Instead, Plaintiff argues that the particular type of disciplinary exercise, carrying eight cadets, was chosen for a discriminatory purpose.  To this end, Plaintiff offers evidence that cadets were trained to drag injured persons to safety rather than carry them, that Defendant Jackson had on the immediately preceding day exhibited derision for Plaintiff's defense of female abilities, and that Defendant Jackson during the course of the exercise ensured that Plaintiff carried the heavier cadets.  In plain language, Plaintiff offers evidence supporting the conclusion that Defendant Jackson wanted to teach Plaintiff a lesson for being a small woman who complained about being treated harshly, and so he designed an exercise that Plaintiff would either be unable to do, or at least would struggle to accomplish in front of her peers.  Plaintiff's evidence suffices to suggest that "a discriminatory reason more likely motivated" Defendant Jackson in his choice of disciplinary exercises than the fittingness of the punishment to the crime, or at least that discrimination "actually played a role in [Defendant Jackson's] decisionmaking process and had a determinative influence on the outcome."  *See id.* Therefore, this evidence satisfies Plaintiff's burden, and as a result Plaintiff has demonstrated the existence of contested material facts that warrant submission of Plaintiff's Count II retaliation

claim to a jury.

**II.      § 1983 Equal Protection**

A denial, under color of state law, of the Fourteenth Amendment right to equal protection of the laws is actionable under 42 U.S.C. § 1983. *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008). Sexual harassment by a state actor may violate the equal protection clause. *Id.* (citing *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989)).

Nevertheless, with regard to Plaintiff's § 1983 claims, the individual Defendants have recourse to the protections of the qualified immunity doctrine, protections which do not apply to Plaintiff's claims under Title VII. "Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct." *Brooks v. Gaenzle*, 614 F.3d 1213, 1219 (10th Cir. 2010) (quoting *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007)) (internal quotation marks and citations omitted). The order of addressing these two prongs is left to courts' discretion. *See Pearson v. Callahan*, 555 U.S. 223 (2009).

Application of the qualified immunity analysis is at times complex and subtle, and so this Court turns for guidance to the United States Supreme Court:

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law.

*Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)) (alteration in original)). In other words, "[a]s the qualified immunity defense has

31

evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Qualified immunity is a recognition of "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority," with the result that "officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 506–07 (1978).  Of course, "the concept of clearly established law should not be applied too literally," and Plaintiff need not provide the Court with "a case presenting the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct." *Johnson v. Martin*, 195 F.3d 1208, 1216 (10th Cir. 1999). "Instead, we merely require the parties to make a reasonable application of existing law to their own circumstances." *Id.*

In this case, viewing the facts in the light most favorable to Plaintiff, the Court first inquires whether Defendants were on notice that they were subjecting themselves to liability by violating Plaintiff's constitutional rights, or in other words whether "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.  The actions that Plaintiff alleges are these:

- Defendant Dunlap inaccurately described the circumstances of Plaintiff's injuries in the workers' compensation forms, had some involvement in the investigation of the complaints against both Norton and Plaintiff, and was involved in Defendant Baird's recommendation that Plaintiff be terminated.

- Defendant Baird recommended Plaintiff's termination (relying in his memorandum on the inaccurate fact that Plaintiff had received a written reprimand), influenced Plaintiff to resign, and ratified the investigations of the complaints against both Norton and Plaintiff.

- Defendant Harlan disregarded Plaintiff's complaints about being ostracized by her co-cadets, and conducted the investigation of the complaints against Norton and Plaintiff.

- Defendant Jackson made remarks regarding differences between males and females,

including a remark that disparaged Plaintiff, conducted the cadet-carrying exercise resulting in Plaintiff's injury, and conducted the investigation of the complaints against Norton and Plaintiff.

These facts, even making all reasonable inferences in Plaintiff's favor, are far from the level at which it would be clear to reasonable officials in Defendants' positions that they were violating Plaintiff's constitutional rights.  Even Defendant Jackson's actions in making a disparaging remark to Plaintiff and conducting the disciplinary exercise, while the Court considers Plaintiff to have survived summary judgment for her retaliation claim, are simply not enough to put Defendant Jackson on notice that he was violating Plaintiff's constitutional rights.  Plaintiff was undergoing training at a law enforcement academy, and as such some rough treatment is not only expected but perhaps necessary to effective training, and the Court cannot, especially in the qualified immunity analysis, ignore the context of Defendant's actions.  *See, e.g.*, *Richardson v. City of Albuquerque*, 857 F.2d 727, 730 (10th Cir. 1988), *overruled on other grounds by Melton v. City of Oklahoma City*, 928 F.2d 920 (10th Cir. 1991) (denying motion for new trial where instructors harassed female cadet, but where evidence showed that all police cadets received harassment as part of the "high-stress training program regardless of their age or sex").  Plaintiff provides no cases where conduct of similar seriousness to Defendants was held to violate the Fourteenth Amendment.  Of course, Plaintiff is not required to find cases directly on point, or with facts precisely similar to these in order to carry her burden.  See *Johnson*, 195 F.3d at 1216.  Nevertheless, all the cases Plaintiff cites and all the cases this Court can find on point involve conduct so much worse, with such substantial evidence of animus, bias, sexualized conversation and conduct, and other acts clearly violative of the plaintiff's rights, that a comparison of Defendants' actions to the actions heretofore held to violate a plaintiff's constitutional rights

would not put Defendants on notice that their conduct violated the law.[9]  With regard to the prior

case law necessary to defeat qualified immunity, "[t]he degree of specificity required . . .

depends in part on the character of the challenged conduct.  The more obviously egregious the

conduct in light of prevailing constitutional principles, the less specificity is required from prior

case law to clearly establish the violation."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.

2004).  On the contrary, when the conduct, as here, is much less egregious, more specificity is

required in order to provide Defendants with reasonable notice that their conduct violated

Plaintiff's rights.  In the absence of such a showing, a reasonable application of existing law

does not make the contours of Plaintiff's constitutional rights sufficiently clear that a reasonable

official in each of the Defendants' places would understand that his actions violated Plaintiff's

constitutional rights.  *See Anderson*, 483 U.S. at 640.  Therefore, Plaintiff fails her burden under

the qualified immunity analysis, and accordingly the Court grants summary judgment to the

individual Defendants on Count III based on the defense of qualified immunity.

---

[9]For instance, in *Markham v. White*, 172 F.3d 486, 488 (7th Cir. 1999), a case involving a situation similar to the current one of a DEA training seminar, the Court listed the following actions by the DEA agent/trainers: (1) beginning the seminar with the promise that male participants would go home that night and have aggressive sexual encounters with their wives; (2) describing women in general as "bitches"; (3) interspersing instructional slides with pictures of nude or scantily clad women; (4) referring in obscene terms to the United States Attorney General as a lesbian and as having a lesbian relationship with the First Lady; (5) using sexual terms to describe law enforcement work, such as describing drug reconnaissance as "getting laid" or "getting her drunk and finding a hotel," talking about DEA agents getting "horny" if they were unable to kill people on a regular basis, talking regularly about male erections in terms such as "chubby," "woody," "johnson," and "pecker," among others; (6) making sexual remarks to or about female participants, such as: (a) one of the defendants, observing Markham prone on the rifle range, grabbing his genitals and yelling, "I'm getting a hard on," causing male participants to laugh; (b) requesting the assistance of female participants during demonstrations because "[i]t's always more exciting to have a pretty girl here to look at"; (c) asking a female participant to turn sideways so that other participants could see her breasts; (d) making repeated sexual references during demonstrations, such as asking a female participant to "use your hot little hands to get this reaction heated up"; and (e) referring to female participants as "hon," "babe," "little girl," "blondie," and "sweet jeans."  *Id.*  The same applies to the cases cited by Plaintiff in the relatively similar context of Title VII hostile work environment.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786 (7th Cir. 2007); *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010).  All these cases involve conduct so blatantly offensive and inappropriate that the perpetrators were clearly on notice that their conduct violated the plaintiff's rights.  By contrast, the conduct by Defendants in this case may have been unwise, unfair, or imprudent, but even in the light most favorable to Plaintiff, their actions could not considered so offensive or inappropriate that Defendants were on notice that they were violating Plaintiff's constitutional rights.

### III.    Retaliation for Filing Workers' Compensation Claim

Plaintiff asserts in Count V that she was terminated in retaliation for filing a workers' compensation claim.[10]  N.M. Stat. Ann § 52-1-28.2 (1978) prohibits retaliation against an employee based solely on the fact that the employee has requested workers' compensation benefits.  New Mexico courts have recognized that the statutory remedies in the Workers' Compensation Act do not exclude a civil cause of action for retaliatory discharge.  *Michaels v. Anglo Am. Auto Auctions, Inc.*, 869 P.2d 279 (N.M. 1994).  The civil cause of action for retaliatory discharge in New Mexico has three elements: (1) the employee must have acted to further an end that public policy encourages, (2) the employer knew of or suspected the employee's action, and (3) the employee's action was a motivating factor in the employer's decision to discharge him.  *Rubio v. McAnally Enterprises, L.L.C.*, 374 F. Supp. 2d 1052, 1054 (D.N.M. 2005).

Plaintiff argues that she was terminated because she filed a workers compensation claim after her knee injury.  A workers' compensation claim is an end that public policy encourages in satisfaction of the first element.  *See Michaels*, 869 P.2d at 280.  Defendants do not contest that they knew of the workers' compensation claim, as Defendant Dunlop actually filled the claim out for Plaintiff.  Therefore, the only question before the Court is whether Plaintiff's workers' compensation claim was the motivating factor behind her termination.

Plaintiff offers the following facts to establish this necessary element of causation:

1.    In the workers' compensation form, Defendant Dunlap wrote that Plaintiff had been injured in a "team building exercise," in which "cadets were carrying each

---

[10] A retaliatory discharge cause of action is only available to at-will employees.  *Silva v. Am. Fedn. of State, County and Mun. Employees*, 37 P.3d 81, 82 (N.M. 2001).  Therefore the Court assumes, although Plaintiff states only that she was a pre-hire Cadet holding the status of a full-time regular employee, that Plaintiff was an at-will employee.

other from point A to point B" and described the exercise as "Team
Building/Fireman's Carry."

2.      Several days after Plaintiff's injury, Defendant Harlan prepared a reprimand for
        Plaintiff for violating the chain of command by contacting Sergeant Taylor about
        her injury; the reprimand was withdrawn when Defendants learned that in fact
        Sergeant Taylor initiated contact with Plaintiff.

3.      Plaintiff's drill instructors had her do exercises arguably not consistent with her
        light duty status.

4.      Defendant Baird's May 21 memorandum recommending Plaintiff's termination
        referenced a written reprimand, and constant breaches of the chain of
        command—apparently therefore referencing the written reprimand that had been
        withdrawn—as part of the reason for his recommendation that she be terminated.

5.      Plaintiff's termination occurred approximately three weeks after she had filed her
        workers' compensation claim.

None of these facts, even taken in the light most favorable to Plaintiff, support an inference that

Plaintiff was terminated because she filed a workers' compensation claim.  The first fact, though

Plaintiff characterizes it as a "cover-up" effort, does not support any inference that Defendants

were covering up unsafe practices.  Plaintiff highlights the fact that Plaintiff alone, not multiple

cadets, was tasked with carrying her fellows, and that it was punishment rather than a team-

building exercise.  Even if the facts supported Plaintiff's characterizations, Defendants'

descriptions of the activities might be vague about the special focus on Plaintiff, but still convey

the basic nature of the activity itself: Plaintiff was told to carry her fellow cadets, and she was

hurt while engaged in that activity.[11]  Therefore if carrying other cadets is an unsafe practice,

---

[11]Plaintiff argues that the very fact that Defendant Dunlop used the term "fireman's carry" to describe the
event, when Plaintiff was not actually using the fireman's carry technique, is evidence of cover-up.  However, the
Court does not agree that such weight can be placed on such small nuances.  Plaintiff was carrying her fellows, and
regardless of her precise technique, the fact that Defendant Dunlop used the term "fireman's carry" rather than trying
to fit a more accurate word picture of exactly what Plaintiff was doing into the workers' compensation form does not
support an inference of cover-up.  "Fireman's carry" conveys the basic idea that Plaintiff was carrying other cadets,
and so does not support an inference of cover-up because it sufficiently conveys the potential danger in the situation.

there is no inference that Defendants were trying to cover up that activity.

The second and fourth facts involve a reprimand for breaking the chain of command, which has no logical relationship to Plaintiff's filing a workers' compensation claim.  If Plaintiff was breaking the chain of command, then she merited the reprimand, and if she did not then the reprimand was correctly withdrawn, and Defendant Baird was inaccurate to reference a written reprimand that had not been awarded to Plaintiff.  Those facts do not support an inference that Plaintiff was terminated because she filed a workers' compensation claim, but instead that she was punished because she was considered to have broken the chain of command at the Academy. Finally, the fact that the drill instructors may have had Plaintiff engage in activities not consistent with the doctor's recommendations may have been unwise, but Plaintiff offers and the Court can discover no logical connection whereby that fact could support any inference that Plaintiff was terminated because of her claim.

Plaintiff has supplied nothing to the Court, even taking the facts in the light most favorable to Plaintiff, that would support a conclusion that she was terminated in retaliation for filing a workers' compensation claim.  Therefore the Court grants Defendants summary judgment as to this claim.

## IV.  Personal Injury

Plaintiff brings a state-law cause of action for personal injury, based on her injury of April 30, 2010.  Ordinarily, the workers' compensation statute prohibits workers whose employers have complied with its requirements from bringing state law claims based on the same injuries already compensated under the statute.  *See* N. M. Stat. Ann. 1978, § 52-1-9 (establishing the exclusivity of the remedies under the Workers' Compensation Statute). Because Defendant County has complied with the requirements of the workers' compensation

statute, Plaintiff must establish that Defendants wilfully injured Plaintiff in order to establish a state-law claim for personal injury. *Delgado v. Phelps Dodge Chino., Inc.*, 34 P.3d 1148 (N.M. 2001). Wilfulness can be established by showing "(1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the injury to occur, or has utterly disregarded the consequences of the intentional act or omission; and (3) the intentional act or omission proximately causes the worker's injury." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1213 (10th Cir. 2006) (citing and quoting *Delgado*, 34 P.3d at 1150).

Plaintiff must offer evidence that the disciplinary exercise was reasonably expected to result in Plaintiff's injury and that Defendants either expected the injury to occur, or utterly disregarded the consequences of the exercise. However, Plaintiff does not provide sufficient evidence to support such a conclusion. The task given Plaintiff—carrying her fellow cadets, some of them significantly outweighing her—was admittedly challenging, and perhaps even too difficult for Plaintiff to accomplish. But Plaintiff was injured in accordance with her particular proclivity to knee injury, a proclivity that she had not disclosed to Defendants, and of which Defendants had no way of knowing.[12] The simple facts that the exercise was very difficult, and that it actually did result in an injury, are not sufficient to show that the exercise was reasonably expected to result in injury. Plaintiff presents no evidence that the exercise is inherently different than other strenuous physical exercises that would be a part of Academy training. "The burden to establish a *Delgado* claim is high. It requires intentional infliction of or willfully causing an injury. Negligence is not enough." *Chairez v. James Hamilton Const. Co.*, 215 P.3d

---

[12]*See* doc. 56 UMF #6 and #26, referencing Plaintiff's deposition, Dr. Fisher's report, and Dr. Legant's record.

732, 740 (N.M. App. 2009) (internal citation omitted).  Plaintiff's proffer, while perhaps enough to show negligence on the part of her instructors, does not meet the high showing, equating to willfullness, required for her personal injury claim to survive.[13]  Therefore Plaintiff fails to offer evidence that could support either the first or second prongs of her Delgado claim, and the Workers' Compensation Act's exclusivity provision prevents her from asserting a common-law personal-injury claim.

## CONCLUSION

Accordingly, for the foregoing reasons, summary judgement is hereby **GRANTED** on the following claims:

- Count I—sex discrimination on the theories of disparate treatment with regard to Plaintiff's discipline and termination, against Defendant County;

- Count III—sex discrimination under § 1983 in violation of the equal protection clause, against Defendants Jackson, Harlan, Dunlap, and Baird in their individual capacities;

- Count IV—personal injury under a state intentional tort cause of action, against Defendants County and Jackson;

---

[13]A comparison with the facts in *Delgado* is enlightening in this matter:

> On the night of June 30, Delgado's shorthanded work crew . . . was being pressured to work harder in order to compensate for the loss of production and revenue incurred after a recent ten day shut down.  Suddenly, the crew experienced an especially dangerous emergency situation known as a "runaway." . . .  Respondents could have shut down the furnace, thereby allowing the safe removal of the ladle of slag.  However, in order to avoid economic loss, Respondents chose instead to order Delgado, who had never operated a kress-haul under runaway conditions, to attempt to remove the ladle alone, with the molten slag still pouring over its fifteen-foot brim. . . .
> When Delgado entered the tunnel, he saw that the ladle was overflowing and radioed White to inform him that he was neither qualified nor able to perform the removal.  White insisted. . . . Shortly after Delgado entered the tunnel, the lights shorted out and black smoke poured from the mouth of the tunnel.  Delgado's co-workers watched as he emerged from the smoke-filled tunnel, fully engulfed in flames.  He collapsed before co-workers could douse the flames with a water hose.  "Why did they send me in there?"  Delgado asked co-workers, "I told them I couldn't do it.  They made me do it anyway.  Charlie sent me in."  Delgado had suffered third-degree burns over his entire body and died three weeks later in an Arizona hospital.

*Delgado*, 34 P.3d at 1151.  Such conduct manifests willfulness at a level that explains why "the burden to establish a *Delgado* claim is high."  *Chairez*, 215 P.3d at 740.  By comparison a strenuous exercise which is hardly remarkable among expected law-enforcement training exercises does not approach the level of willfulness required for a *Delgado* claim.

- Count V—retaliatory discharge for filing a workers' compensation claim, in violation of the workers' compensation statute, against Defendant County.

The Plaintiff has not demonstrated the existence of facts which, taken in the light most favorable to her assertions, would support the above claims.  Because all claims against the individually named Defendants, Defendants Harlan, Jackson, Dunlap, and Baird, have been dismissed, those Defendants are hereby **DISMISSED** from this case, and the case heading shall be adjusted accordingly.

However, summary judgment is hereby **DENIED** with regard to the following claims:

- Count I—sex discrimination under Title VII on the theory of hostile workplace sexual harassment, asserted against Defendant County;

- Count II—retaliation for making a complaint of sex discrimination in violation of Title VII, against Defendant County.

Plaintiff has established the existence of factual questions with regard to whether Plaintiff was subjected to a hostile workplace or retaliation in violation of Title VII, and therefore resolution of these questions, and these alone of Plaintiff's asserted claims, is proper for a jury.

**SO ORDERED**.

_____

UNITED STATES DISTRICT JUDGE